NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 09-2865
_____

DANIEL BERNARD MANCHAS, III,
Appellant

v.

SUPERINTENDENT OF SCI HUNTINGDON;
ATTORNEY GENERAL OF THE STATE PENNSYLVANIA
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 2-07-cv-01112)
District Judge:  The Honorable Amy Reynolds Hay
_____

ARGUED OCTOBER 20, 2010

BEFORE:  HARDIMAN, GREENAWAY, JR., and NYGAARD, Circuit Judges.

(Filed: May 3, 2011 )

David R. Fine, Esq. (Argued)
K & L Gates
17 North Second Street
18th Floor, Market Square Plaza
Harrisburg, PA  17101

        Counsel for Appellant

Jack R. Heneks, Jr., Esq. (Argued)
Nancy D. Vernon, Esq.
Office of the District Attorney of Fayette County

61 East Main Street
Fayette County Courthouse
Uniontown, PA  15401

Counsel for Appellees

_____

OPINION OF THE COURT
_____

NYGAARD, Circuit Judge.

We granted a certificate of appealability to address certain claims raised by

Petitioner, Daniel Manchas, who was convicted of first-degree murder in 2001.  After a

thorough review of this case and oral argument, we will affirm the judgment of the

District Court denying Manchas' petition for habeas relief.

I.

Following a jury trial, Manchas, then 18 years old, was convicted

in the Court of Common Pleas of Fayette County of first degree murder, aggravated

assault, criminal conspiracy to commit murder and six counts of recklessly endangering

another person.  On October 19, 2001, he was sentenced to life in prison without parole

and six consecutive terms of one to two years each on the reckless endangerment charges.

No further penalty was imposed on the aggravated assault or conspiracy convictions.  The

Pennsylvania Superior Court reported the facts underlying Manchas' conviction as

follows:

> [O]n the evening of February 3, 2001, [Manchas] met with
> the victim [Robert Cumberland, Sr.], Catherine McKenna and
> George Simon for the purpose of selling cocaine to the
> victim. When the victim allegedly shorted [Manchas] by $20,

2

[Manchas] became enraged and threw the money to the ground. The victim then picked up the money and told [Manchas] that he intended to keep both the money and the cocaine. Simon testified that as the victim and his two associates drove away, [Manchas] followed the trio and threatened Simon [that] he would "get his boys and come and see me [Simon] and shoot me or us."

Later that same evening, [Manchas] went to the home of Robert Cumberland, Jr., screaming that Cumberland, Sr., and his friends had "ripped him off on a drug deal." Cumberland, Jr. then telephoned Simon at his home and allowed [Manchas] to speak with him. [Manchas] advised Simon that he and Cumberland, Jr. intended to come to [Simon's] home and, there was "going to be a bad scene." In the wee hours of the morning, [Manchas] drove to Simon's home, accompanied by Cumberland, Jr., and toting a scoped rifle owned by same. [Manchas] fired a bullet through the lighted window of Simon's home, striking [Robert Cumberland, Sr.] in the head and killing him instantly.

[Manchas] then drove past Simon's home, turned around, drove back, stopped in front of the home, got out of the car and fired a second shot into the home.

At trial, Manchas testified that he fired the first shot through the front wall of the trailer without seeing anyone. The Commonwealth maintained that Manchas saw the victim in the window and shot him. Additionally, Manchas testified that although he fired first, the second shot through the window was fired by Robert Cumberland, Jr. Manchas argued that even if his co-conspirator's testimony is to be credited, Manchas fired the first (and fatal) shot through the wall of the trailer, not the window, and, therefore, any killing was accidental and not intentional.

After Manchas' conviction and sentence were affirmed on direct appeal, he filed a pro se PCRA petition. Counsel was appointed and filed an amended PCRA petition.

3

Manchas then retained private counsel, who filed a second amended PCRA petition. The PCRA court held a hearing at which Manchas, his mother, his sister and his trial counsel testified. The PCRA court denied his petition and the Superior Court affirmed.[1] After the conclusion of his PCRA proceedings, Manchas filed a habeas petition in the United States District Court for the Middle District of Pennsylvania, which transferred it to the Western District, where Manchas was located at the time of filing. The Magistrate Judge reached all of Manchas' claims on the merits, recommending that relief be denied. Over Manchas' objections, the District Court agreed. Manchas timely filed a notice of appeal and requested a certificate of appealability.

## II.

Our certificate of appealability permitted Manchas to brief the following issues relating to his trial counsel's alleged ineffectiveness:

1. counsel's failure to retain a forensic expert or crime scene investigator to testify on Manchas' behalf;
2. counsel's failure to interview Chad Simon or call him as a witness; and
3. counsel's failure to cross-examine the Commonwealth's witnesses on the question of where the first shot came from.

We also permitted Manchas to address the issue of whether he was entitled to an evidentiary hearing in the District Court. On appeal, Manchas' arguments concerning ineffectiveness are all based on the proposition that "he himself fired the first and fatal shot through the wall of the trailer and the second shot was fired through the window

---

[1] The Pennsylvania Superior Court adopted the trial court's PCRA opinion as its own. Therefore, our reference to the PCRA court in this opinion contemplates the trial court's opinion.

4

after the victim was already dead." According to Manchas' theory, he lacked the specific intent to kill and cannot be legally guilty of first degree murder. This position is in contrast to the Commonwealth's theory, which held that Manchas fired the first shot through the uncovered and lighted window with the intent to shoot and kill the victim.

Additionally, we granted his request for the appointment of counsel. New counsel filed another request for a certificate of appealability, seeking to challenge the sufficiency of the evidence. We granted this certificate as well.

## A.

Before getting to the discussion of the ineffective assistance of counsel issues, we briefly detour. Manchas argues that a *de novo* standard of review applies to his appeal, not the more deferential standards of AEDPA. His argument is that the state courts did not address some of his claims on the merits. Specifically, he maintains that the state courts misunderstood his claims as presented and, therefore, failed to adjudicate them on the merits. He is mistaken. The PCRA court correctly found the nature of his claims to be that of ineffective assistance of counsel and decided the claims under the applicable standards. AEDPA applies.

Under AEDPA, an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. *See Greene v. Palakovich*, 606 F.3d 85, 97-8 (3d

5

Cir. 2010) (citing 28 U.S.C. § 2254(d)(1)). For AEDPA purposes, the clearly established

federal law for ineffective assistance of counsel claims is the two-prong test enunciated in

*Strickland v. Washington*, 466 U.S. 668, 687, (1984). Under *Strickland*,

> the defendant must show that counsel's performance was
> deficient. This requires showing that counsel made errors so
> serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment. Second,
> the defendant must show that the deficient performance
> prejudiced the defense. This requires showing that counsel's
> errors were so serious as to deprive the defendant of a fair
> trial, a trial whose result is unreliable.[2]

*Id.*

B.

Manchas first argues that trial counsel was ineffective for failing to consult or

retain a forensic expert or crime scene investigator to testify on his behalf. He

specifically faults his trial counsel for her failure to call expert witnesses who could have

corroborated Manchas' theory of the case, namely that, of the two shots fired, his was

first and it went through the front of the trailer, near the kitchen. He maintains that since

he fired through the wall and did not know what was on the other side, he did not have

specific intent to kill anyone.

Manchas argued at his PCRA evidentiary hearing that he "thought" experts might

have helped his case. His problem, however, is that he failed to provide any support for

his speculation. The PCRA court made the following findings of fact:

---

[2] Our analysis of the deficiency and prejudice prongs does not have to proceed in any
specific order; it is likely often "easier to dispose of an ineffectiveness claim on the
ground of lack of sufficient prejudice." *Strickland*, 466 U.S. at 697.

3. At the evidentiary hearing, the defendant offered no evidence that a forensic or DNA expert would have provided testimony that would have raised a question as to the reliability of the conviction.

4. At the evidentiary hearing, the defendant offered no evidence that a crime scene investigator would have provided testimony that would have raised a question as to the reliability of the conviction.

Because Manchas failed to provide evidence in support of this claim, the PCRA court held that he failed to carry his burden to show prejudice. Put another way, to obtain PCRA relief, Manchas had the burden of establishing that an expert's testimony would have, in fact, been helpful to his defense. He presented no such evidence and, therefore, he provided no basis to conclude that he suffered prejudice. The PCRA court's ruling was not contrary to nor an unreasonable application of federal law. The PCRA court found that, by failing to identify specific factual prejudices, Manchas' claims for ineffective assistance of counsel could not stand. The PCRA court's holding comports with the requirements of *Strickland* and, therefore, the District Court did not err by denying habeas relief.

In support of his habeas petition in the District Court, Manchas belatedly produced a purported "expert report" from Robert Hicks, who identifies himself as an "investigative forensic reporter and publisher." The Magistrate Judge correctly determined that this late-produced "expert" report could not be considered given that it was not presented to the PCRA court. The Magistrate Judge further did not err by not holding an evidentiary hearing on this report. AEDPA forbids a federal court from

7

holding an evidentiary hearing on any claim where the petitioner has failed to develop a factual basis for that claim in state court proceedings. *See* 28 U.S.C. § 2254(e)(2).

## C.

Next, Manchas argues that trial counsel was ineffective for failing to call Chad Simon (one of the four adults in the trailer at the time of the shooting) as a defense witness.[3] Simon made several statements—both oral and written—to the police on the night of the murder. At the PCRA hearing, Manchas testified that, before the trial, he learned of Simon's statements to the police and discussed with counsel calling Simon as a defense witness. Manchas maintained that Simon had "first-hand knowledge of where the first and fatal shot came from," and believed that Simon's testimony would be "vital."

At the PCRA hearing, trial counsel expressed her belief that Simon's testimony would not be helpful to the defense:

> Q:    And do you recall if there were any statements that
>       were given by Mr. Chad Simon that appeared in the
>       discovery?

---

[3] The other adults in the trailer at the time of the shooting included George Simon (Chad's older brother), Cathy McKenna, and Robert Cumberland Sr. (the victim and father of Manchas' co-conspirator). George Simon testified at trial that he was taking a bath when he heard Chad say that a car pulled up in front of the house. As he was coming out of the bathroom, George heard the first shot. He stated that he believed the bullet came through the window because he saw a hole in the window and the victim lying in front of it on the floor. Cathy McKenna testified that she was sitting in the living room when she heard the first shot. She heard the victim fall to the floor. She then got off the couch and onto the floor herself, dialing 911. While she was on the phone, she heard the second shot. She did not testify as to the direction from which the bullets came or whether either of the bullets entered the trailer through the window.

8

A: I no longer have the discovery, however, what I recall are two typewritten interviews by two different police officers and I believe a handwritten statement by Mr. Simon.

Q: And based on the statements that you reviewed in the police report, and particularly the handwritten statement given by Mr. Simon, did you make a determination as to whether or not he would be a witness who would be helpful to the defense?

A: Yes.

Q: And what decision did you come to in that regard?

A: That it would not be helpful.

Q: What led you to that conclusion that he would not be a helpful witness?

A: I don't have the handwritten statement, so I don't recall exactly what was said in it; however, the two typed reports, one by Trooper Cross, I believe, and I believe the other one was Trooper Urey, but I'm not certain; they both had the first shot – no matter where – if it came from kind of the front of the trailer through a window, was the first shot that the victim encountered.

Q: The first shot?

A: The first shot.

Q: And

A: And that was in both typed statements and I believe also the handwritten.

App. at 52-53. Counsel continued:

Q: I'm going to show you what I marked as commonwealth's exhibit Number 1 and ask you to look over that. Tell me if you recall ever seeing that.

A: Yes.

Q: And is that the handwritten statement that was provided in discovery from Chad Simon?

A: Yes.

Q: Okay. And was that the statement that you were referring to where Mr. Chad Simon indicates in there, about halfway through, that he heard the first shot by the window and that was the shot that hit the victim?

9

> A:      Right, and that he saw, in the living room, saw [the victim] on the floor.
>
> Q:      And was that the statement that you indicated was a factor, of course, in not calling Mr. Chad Simon?
>
> A:      Yes.

Counsel also testified that Manchas himself agreed with this decision:

> THE COURT:      Did you discuss that with the defendant?
>
> A:      Yes.
>
> THE COURT:      Did the defendant agree with you not to call [Simon]?
>
> A:      Yes.

Appendix at 54-55.

A defendant who alleges that counsel was ineffective due to strategic errors, such as the failure to call a particular witness, must show both that the attorney's performance was lacking, and that this deficient performance resulted in prejudice. *Hess v. Mazurkiewicz*, 135 F.3d 905, 907-08 (3d Cir. 1998) (citing *Strickland*, 466 U.S. at 687 (1984)). Witness selection is entrusted to counsel's sound judgment, not to the defendant. *Virgin Islands v. Weatherwax*, 77 F .3d 1425, 1434 (3d Cir.), *cert. denied*, 519 U.S. 1020 (1996). We have held that "it is critical that courts be 'highly deferential' to counsel's reasonable strategic decisions and guard against the temptation to engage in hindsight." *Marshall v. Hendricks*, 307 F.3d 36, 85 (3d Cir. 2002) (quoting *Strickland*, 466 U.S. at 689-90). Given that Manchas never denied firing the first shot, trial counsel's decision not to call Simon as a witness fell within the wide range of reasonable professional assistance as contemplated by *Strickland's* first prong.

The PCRA Court specifically held that trial counsel exercised her professional judgment as to the exclusion of Chad Simon's testimony and made a strategic decision not to call him at trial:

> At the evidentiary hearing, Trial Counsel testified that she was familiar with the three statements given by Chad Simon to the police and that those statements reflected that it was the first shot (the one that the defendant admitted firing) that struck the victim. By virtue of the statements, counsel determined that the witness would not be helpful to the defense. After making that determination, counsel discussed not calling Simon with the Defendant, and the Defendant agreed with her not to call Simon.
>
> * * *
>
> [T]his Court finds that the proffered testimony of Simon was corroboration of the Commonwealth's evidence and would have been prejudicial to the Defense. Trial counsel exercised her professional judgment and properly determined that Simon's testimony would have harmed, rather than aided in the Defendant's defense, a decision made with the agreement of the Defendant.

We agree with the District Court here that this was not "an unreasonable determination of the facts in light of the evidence presented" or an unreasonable application of Supreme Court precedent under AEDPA's deferential standard of review. § 2254(d)(2).

## D.

Manchas next argues that trial counsel was ineffective for failing to cross-examine any of the Commonwealth witnesses as to the order of the gunshots, where the first shot came from, and which shot struck the victim. This claim is closely related to the others.

11

The PCRA court concluded that Manchas' claim failed to show how he was prejudiced by counsel's cross-examination as conducted. Specifically, the court found that Manchas made no offer of proof alleging facts that would have rendered counsel's performance ineffective.

We affirm the District Court's conclusion that this decision was not contrary to, or an unreasonable application of, federal law. The PCRA and Superior Court's test for prejudice is indistinguishable from the prejudice analysis in *Strickland*. *See* 466 U.S. at 687. The PCRA court's finding of a lack of prejudice was not an unreasonable application of *Strickland*. *Id*. at 694 (requiring defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").[4]

### III.

Upon motion by appointed habeas counsel, we granted an additional certificate of appealability to review whether the evidence was sufficient on specific intent to convict Manchas of first-degree murder. Finding the evidence sufficient, the petition will be denied on this claim as well.

Here, there was ample evidence for the jury to find that Manchas had specific intent. First, there is Manchas' statement that he was going to shoot George Simon.

---

[4] We granted Manchas a certificate of appealability on the question of whether he was entitled to an evidentiary hearing in the District Court on these issues. To be entitled to an evidentiary hearing, Manchas must make a *prima facie* showing that would enable him to prevail on the merits of the asserted claim. 28 U.S.C. § 2254(e)(2). If the record refutes his factual allegations or otherwise precludes habeas relief, however, no evidentiary hearing is required. *See id*. Since we have determined that there is no merit to Manchas' claims, Manchas was not entitled to an evidentiary hearing.

Second, Manchas told Simon that he would be coming to his house and it would be a "bad scene." Third, Manchas was angry at the victim and at Simon for ripping him off during a drug deal. Further, Cumberland testified that he heard Manchas tell Simon that he was going to kill him (Simon). Fifth, Manchas took a rifle with a high-powered scope, aimed it and fired two shots into the trailer. From this evidence, a jury could have reasonably found that Manchas intended to kill when he fired the shots into the trailer.

IV.

After our independent review, we will affirm the judgment of the District Court substantially for the reasons set forth in the Magistrate Judge's thorough and thoughtful Report and Recommendation, which the District Court rightly adopted.

13